SEP 05 2017

S.D. OF N.Y.

**17 MAG . 6692**

Approved:  _Michael Kiely_
BRENDAN F. QUIGLEY/ELISHA J. KOBRE
Assistant United States Attorneys

Before:  HONORABLE ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

☐ ORIGINAL

DOC #____ ____

- - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA              :
                                      :
            - v. -                    :
                                      :
CRAIG CARTON and                      :
MICHAEL WRIGHT,                       :
                                      :
            Defendants.               :
                                      :
- - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violations of
15 U.S.C. §§ 78j(b) & 78ff;
17 C.F.R. § 240.10b-5; 18
U.S.C. §§ 2, 371, and 1343

COUNTY OF OFFENSE:
New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

SEAN SWEENEY, being duly sworn, deposes and says that he is
a Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

COUNT ONE
(Conspiracy to Commit Securities Fraud and Wire Fraud)

1.    From at least in or about September 2016 through at
least in or about January 2017, in the Southern District of New
York and elsewhere, CRAIG CARTON and MICHAEL WRIGHT, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate and agree together
and with each other to commit offenses against the United
States, to wit, securities fraud, in violation of Title 15,
United States Code, Sections 78j(b) & 78ff, and Title 17, Code
of Federal Regulations, Section 240.10b-5; and wire fraud, in
violation of Title 18, United States Code, Section 1343.

2.    It was a part and object of the conspiracy that CRAIG
CARTON and MICHAEL WRIGHT, the defendants, and others known and
unknown, willfully and knowingly, directly and indirectly, by
the use of the means and instrumentalities of interstate
commerce, and of the mails, and of facilities of national
securities exchanges, would and did use and employ, in

connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

3.   It was further a part and an object of the conspiracy that CRAIG CARTON and MICHAEL WRIGHT, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Overt Acts

4.   In furtherance of the conspiracy and to effect the illegal objects thereof, CRAIG CARTON and MICHAEL WRIGHT, the defendants, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about December 12, 2016, WRIGHT wired $200,000 in investor funds to a bank account controlled by CARTON.

b.   On or about December 18, 2016, CARTON emailed an investor a purported agreement under which an entity controlled by CARTON had the right to purchase a large block of event tickets.

(Title 18, United States Code, Section 371.)

2

## COUNT TWO
### (Wire Fraud)

5.     From at least in or about September 2016 through at least in or about January 2017, in the Southern District of New York and elsewhere, CRAIG CARTON and MICHAEL WRIGHT, the defendants, in the Southern District of New York and elsewhere, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, CARTON and WRIGHT solicited and then misappropriated millions of dollars from investors, through the use of e-mail messages, telephone calls, and wire transfers, by making false and misleading representations regarding how the investors' funds would be used and regarding agreements relating to the purchase of blocks of tickets to live events, and aided and abetted the same.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Securities Fraud)

6.     From at least in or about September 2016 through at least in or about January 2017, in the Southern District of New York and elsewhere, CRAIG CARTON and MICHAEL WRIGHT, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed, and caused others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, CARTON and WRIGHT solicited investments in ventures related to the

purchase and re-sale of event tickets through materially false misrepresentations and then misappropriated investor funds for their own use and the use of others, and aided and abetted the same.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.    I have been a Special Agent with the FBI for since January 2016.  I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses.  I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

8.    The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to records and other documents I have reviewed in the course of this investigation. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Relevant Persons and Entities

9.    At all times relevant to this Complaint:

a.    CRAIG CARTON, the defendant, resided in New York, New York and controlled a company purporting to be in the business of purchasing large blocks of tickets to live events and reselling those tickets at a profit (the "CARTON Entity").

b.    MICHAEL WRIGHT, the defendant, was an associate of CARTON, who resided in New Jersey and worked in New York, New York.

c.    A co-conspirator not named herein ("CC-1") was an associate of CARTON and WRIGHT, who resided in New York, New

York. CC-1 is currently charged in this District in connection with, among other things, a fraudulent scheme in which he solicited investments based upon false representations that the investments would be used to fund the bulk purchase of tickets to various live events, including Broadway shows and concerts, which CC-1 would resell at a profit in the secondary market. CC-1 conducted this scheme, among other things, through a company controlled by CC-1 (the "CC-1 Entity").

          d.   The "Concert Promotion Company" is a company based in Los Angeles, California, and among other things, promotes live music and entertainment events.

          e.   The "Sports and Entertainment Company" is a New York-based company that operates two arenas in the New York metropolitan area.

          f.   The "Hedge Fund" is a global investment management firm based in New York, New York.

### Summary of the Fraudulent Scheme

    10.  As set forth in more detail below, from at least in or about September 2016, through at least in or about January 2017, CRAIG CARTON and MICHAEL WRIGHT, the defendants, along with CC-1, worked together to solicit individuals and entities to invest in the bulk purchase of tickets to live events, which would be re-sold at a profit on the secondary market.  In soliciting these investments, CARTON and CC-1 both provided potential investors with purported agreements that gave CC-1 and CARTON access to purchase blocks of tickets to live events.  In fact, these agreements were fraudulent, and CC-1 and CARTON had not, in fact entered into these agreements.  After receiving investor funds based on these false representations, CARTON, WRIGHT, and CC-1 misappropriated those funds, using them to, among other things, pay personal debts and to repay prior investors as part of a Ponzi-like scheme.

### Background

    11.  Based on my review of email and text messages obtained pursuant to search warrants, I have learned that during the summer and fall of 2016, CRAIG CARTON and MICHAEL WRIGHT, the defendants, along with CC-1 discussed potential ventures related to the purchase and/or resale of event tickets and, also, expressed concern over mounting debt. For example:

          a.   On or about September 2, 2016, CC-1 wrote a text

message to CARTON and WRIGHT, stating the following:

> CC - MW and I caught up today and are formulating
> a schedule to clean up the debt. It makes sense
> that we as a three man connect Monday and all
> agree on a plan, timing and mechanism with
> division of responsibilities to execute. This
> will be definitive and have no deviation. We will
> all be absolutely in sync so nobody has to worry
> moving forward. Let me know a good time and
> location brother. Love you both[.]

Based on my training and experience, I believe CC-1 was
telling CARTON ("CC") that he and WRIGHT ("MW") had spoken and
were "formulating a schedule to clean up the debt."

     b.   Three days later, on September 5, 2016, WRIGHT
emailed CARTON and CC-1, "for the sake of our conversation
tomorrow," and outlined "the debt past due and due next week."
WRIGHT listed several apparent creditors, to whom he, CC-1,
and/or CARTON were indebted over a million dollars.  WRIGHT
listed eight possible options for re-paying the debt, including
"Run to Costa Rica, change name, and start life all over again –
may not be an option."

     c.   CARTON responded to WRIGHT and CC-1, stating
"don't forget I have $1m coming tomorrow from ticket investor[.]
will need to be discussed how to handle."

     d.   On September 7, 2016, CARTON emailed WRIGHT and
CC-1, stating "your guys call more than mine but if we get [a
Holiday Concert Tour][1] then I would vote to bring in $$$ today to
wipe out the debt that's due and to extend it to sell tickets .
. . . I would put [Investor-1][2] in [the Holiday Concert Tour]

---

[1] The Holiday Concert Tour is a well-known concert tour that took
place in a number of cities in the United States in November and
December 2016.  I am currently not aware of evidence that
CARTON, WRIGHT, and CC-1 obtained tickets to the Holiday Concert
Tour or actually marketed an investment opportunity relating to
the Holiday Concert Tour.

[2] Investor-1, who was referred to by his first name only in the
email above, had invested $1,000,000 with CARTON and CC-1 in
August 2016 to finance CARTON's purchase of tickets for a
concert tour of a well-known performer, who purportedly had an
agreement to give CC-1 access to a large block of tickets.

and borrow against projected profits." Based on my training, experience, and involvement in this investigation, I believe that CARTON was suggesting that they attempt to solicit new investors for the Holiday Concert Tour so they could misappropriate those investor funds to "wipe out the debt that's due."

     e.    On or about October 12, 2016, WRIGHT emailed CARTON. The subject line of the mail was "Don't stop believin [sic]." WRIGHT stated, in substance and relevant part, "I don't stop believing in you, you have a relentless will. . . . My concern is getting deeper than we are when payments will be due to some that won't take a refi. I've started peppering a refi to our investors, as you know it's a game. We have a big debt and more sources have been refi'd a couple of time so there's concern." Based on my training, experience, and involvement in this investigation, I believe that when WRIGHT stated he had been "peppering a refi to our investors" he was stating that he had been asking investors to refinance previous investments by reinvesting in certain ventures, including purported investment opportunities related to the purchase and re-sale of event tickets, in lieu of giving those investors a return on their investments. When WRIGHT stated to CARTON, "as you know it's a game," I believe he meant that he knew these investments had been diverted to other purposes, including the payment of debt and the re-payment of previous investors and/or creditors as part of a Ponzi-like scheme.

## Negotiations Between CARTON and the Hedge Fund

    12.    Based on my involvement in this investigation, including my review of emails and text messages and my conversations with another FBI agent involved in this investigation ("Agent-1"), who participated in interviews with Hedge Fund personnel, I have learned the following:

     a.    Later on October 12, 2016, CRAIG CARTON, the defendant, sent text messages to CC-1[3] stating, "Guys. I've done it. One investor ready committed $10m liquid and $40m LOC with $50m more if needed. I need some info. List of shows we can 100% prove access to tickets. How many when and how it's

---

[3] The message was obtained via a search warrant on CC-1's phone, following his arrest. Although the report of the extraction of the data from the phone indicates only CC-1's phone number on the "to" line of this message, I believe the message may also have been sent to WRIGHT, given CARTON's use of the salutation "guys."

returned and predicted success." Based on my training, experience, and participation in this investigation, I believe that CARTON was stating that he had met with an investor who could provide $10 million in cash, with a $40 million line of credit ("LOC") to finance a purported investment in the purchase of tickets to live events, which would then be re-sold on the secondary market.

b.   Around this time, CARTON and the Hedge Fund had begun negotiating regarding a transaction in which the Hedge Fund would extend CARTON capital to finance CARTON's purchase of event tickets, which CARTON would then re-sell at a profit. Accordingly, I believe that, in the text message above, CARTON may have been referring to early-stage negotiations with the Hedge Fund.

c.   Discussions between CARTON and the Hedge Fund progressed over the next two months and were nearing completion in early December.  Further, I understand that the deal was to be structured as a revolving loan agreement, in which CARTON could draw down from a $10 million loan provided by the Hedge Fund to finance the purchase of tickets to certain events and that the Hedge Fund would receive a share of the profits earned from the re-sale of the tickets.

d.   On or about December 6, 2016, shortly before the deal between CARTON and the Hedge Fund closed, CC-1 texted CARTON and MICHAEL WRIGHT, the defendant, stating:

> We use [the Hedge Fund] money to repay debts. Where do we get the money to buy tickets and further more what deal do we offer the money provider for the tickets? We can not pay [Hedge Fund] with other people's money right away because it does not work. We need [Hedge Fund] to buy deals with long lead times and earn money in the interim and use the earned money to replace the [Hedge Fund] funds in ticket deals on the future. That is the math we have to figure out and work it into a schedule to get down to zero[.]

Based on my training, experience, and participation in this investigation, I believe that CC-1 was stating that the Hedge Fund's investment could be used, not to finance the purchase of tickets, but to "repay" CC-1, CARTON, and WRIGHT's existing debts.  CC-1 also expressed concern, however, about their ability to repay the Hedge Fund promptly and suggested that they

induce the Hedge Fund to buy longer-term ticket investment deals ("deals with long lead times") allowing them more time to repay the Hedge Fund's investment they planned to misappropriate.

      e.   CARTON responded to CC-1, copying WRIGHT, stating:

> Agreed. My thought was if we could sell a bunch of [Band-1] tickets next two weeks we would have legit profit to use and at the same time createbamazing [sic] good will with [the Hedge Fund.]

Based on my training, experience, and involvement in this investigation, I believe that CARTON "agreed" with CC-1 to misappropriate the Hedge Fund's investment, using it to re-pay debts, with the hope that proceeds from the sales of tickets for concerts for a particular band, Band-1 would yield "legit profits" that could be used to pay back the Hedge Fund.

      f.   On December 7, 2016, CARTON emailed the Hedge Fund five agreements between (i) CC-1 and a company controlled by CC-1 (the "CC-1 Entity") and (ii) the "Concert Promotion Company." In each of the purported agreements (the "Concert Promotion Company Agreements"), the Concert Promotion Company agreed to sell the CC-1 Entity up $10,000,000 worth of tickets to each of the concert tours. I have spoken to a high-ranking official of the Concert Promotion Company (the "Concert Promotion Company Executive") who purportedly signed the Concert Promotion Company Agreements. The Concert Promotion Company Executive stated, in sum and substance, that he had not signed the Concert Promotion Company Agreements and had not entered into any agreement with CC-1 or the CC-1 Entity.

      g.   On or about December 8, 2016, the Hedge Fund and CARTON executed the revolving loan agreement (the "Revolving Loan Agreement"), under which the Hedge Fund agreed to provide CARTON with up to $10 million, for the purpose of funding investments in the purchase of tickets of events. The Revolving Loan Agreement provided, in sum and substance, that the proceeds of the loan would be used only to (i) purchase tickets pursuant to agreements for the acquisition of tickets, including the Concert Promotion Company Agreements, which were attached as exhibits of the Revolving Loan Agreement and (ii) cover limited business expenses not to exceed $25,000 per year. The Hedge Fund would receive a share of the profits from the resale of the

tickets.

## CARTON, WRIGHT, and CC-1 Misappropriate the Hedge Fund's Initial Investment

13.    Based on, among other things, my review of emails, text messages, and bank records and my conversations with Agent-1, I have learned the following:

a.    On December 8, 2016, the same day that CRAIG CARTON, the defendant, and the Hedge Fund executed the Revolving Loan Agreement, the Hedge Fund wired $700,000 into a bank account belonging to the CC-1 Entity (the "the CC-1 Entity Account"). Based on my review of bank records, I have learned that this wire was transmitted from New Jersey to Manhattan. The purpose of this wire was to finance the purchase of tickets pursuant to the Concert Promotion Company Agreements.

b.    However, the following day, December 9, 2016, CC-1 wired $700,000 the CC-1 Entity Account to a bank account for entity controlled by CARTON and MICHAEL WRIGHT, the defendant, for which WRIGHT was the sole signatory (the "CARTON/WRIGHT Entity-1 Account"). Before receiving this wire, the CARTON/WRIGHT Entity-1 Account had an approximately $6,000 balance.

c.    Three days later, on or about December 12, 2016, WRIGHT wired $200,000 from the CARTON/WRIGHT Entity-1 Account to CARTON's personal bank account (the "CARTON Bank Account"). That same day, CARTON wired $200,000 from the CARTON Bank Account to a casino. Also on December 12, WRIGHT wired $500,000 from the CARTON/WRIGHT Entity-1 Account to a particular individual ("Individual-1"). Based on my review of emails and my interview with Individual-1, I have learned that Individual-1 had lent CARTON $500,000 which was due on December 12. As such, I believe the $500,000 wire from the CARTON/WRIGHT Entity-1 Account to Individual-1 was intended to re-pay CARTON's loan.

## CARTON Provides the Hedge Fund with a Fraudulent Agreement to Obtain Additional Investments

14.   Based on, among other things, my review of emails, text messages, and bank records and my conversations with Agent-1 regarding his interviews with personnel of the Sports and Entertainment Company, I have learned the following:

a.   Over the next several days, CRAIG CARTON, the defendant, and the Hedge Fund continued to discuss additional potential investments pursuant to the Revolving Loan Agreement, including additional investments through the CC-1 Entity and through the Sports and Entertainment Company.  CARTON, along with MICHAEL WRIGHT, the defendant, and CC-1 also continued to discuss the repayment of certain debt.  In emails on December 13 and December 15, 2016, for example, WRIGHT told CARTON and CC-1 that he owed $966,000 to a particular entity ("Entity-1") on December 22, 2016.

b.   On or about December 16, 2016, CARTON sent the Hedge Fund another agreement, purportedly between the CC-1 Entity and the Concert Promotion Company, which gave the CC-1 Entity the right to purchase $10 million worth of tickets to a well-known band's ("Band-2") upcoming North American concert tour (the "Band-2 Agreement").  The Band-2 Agreement was substantially similar in format and appearance to the Concert Promotion Agreements discussed above.  The Band-2 Agreement also purported to be signed by the Concert Promotion Company Executive.  Again, however, the Concert Promotion Executive has told the FBI, in sum and substance, that he did not sign the Band-2 Agreement or enter into any other similar agreement with the CC-1 or the CC-1 Entity.

c.   Also on December 16, CARTON forwarded the Hedge Fund an email (the "December 16 E-Mail"), which was purportedly sent to CARTON from an executive of the Sports and Entertainment Company (the "Sports and Entertainment Company Executive").  The email from the Sports and Entertainment Company Executive stated "If everything is in place please execute and we will do the same" and attached an unsigned agreement, purportedly between the Sports and Entertainment Company ("the Sports and Entertainment Company Agreement")[4] and the CARTON Entity.  The

---

[4] In fact, based on my conversations with Agent-1, who interviewed representatives of the Sports and Entertainment Company, I have learned that the legal name of the Sports and Entertainment Company as set forth in this Agreement is actually

Sports and Entertainment Company Agreement purported to give the CARTON Entity the right to purchase $2,000,000 of tickets to concerts at one of the venues operated by the Sports and Entertainment Company (the "Venue").

        d.    However, based on, among other things, Agent-1's interview of the Sports and Entertainment Company Executive, I have learned that the Sports and Entertainment Company Executive never sent the email described in the paragraph above.  Further, I understand that a search of the e-mail servers of the Sports and Entertainment Company revealed that no such e-mail had been sent.  Instead, the email appears to have been fraudulently created by CARTON, using a previous email he received from the Sports and Entertainment Company Executive.

        e.    Over the next several days, CARTON and Hedge Fund executives continued to discuss how to allocate the remainder of the Revolving Loan Agreement principal.

        f.    On December 18, 2016, a representative of the Hedge Fund sent CARTON an email stating, in substance and relevant part: "Craig, let's go with the allocation you recommended yesterday: $1 million to [Band-2] North American tour" and $2,000,000 to two concerts at the Sports and Entertainment Company Venue.  Further, the Hedge Fund representative stated, "[f]or the [Sports and Entertainment Company Venue] shows, we'd like to wire directly to the" Sports and Entertainment Company.  The Hedge Fund representative further stated, "[f]or each investment, we'll need finalized contracts . . . ."

        g.    Later that day, CARTON sent the Hedge Fund a copy of the Sports and Entertainment Company Agreement, similar to the agreement attached to the December 16 E-mail, but this time containing the purported signature of the CEO.  However, based on Agent-1's interview of the CEO, I have learned that the CEO never signed this Agreement, and that no such agreement existed between CARTON or the CARTON Entity and the Sports and Entertainment Company, nor did the Sports and Entertainment Company have any such agreement with CC-1 or WRIGHT.

        h.    On or about December 19, 2016, a Hedge Fund representative (the "Hedge Fund Representative") emailed CARTON stating, in substance and relevant part, that the Hedge Fund was prepared to wire (i) $1,000,000 to the CC-1 Entity for the Band-

incorrect, providing further evidence, in addition to what is set forth below, that the Agreement is fraudulent.

2 North American tour and (ii) $2,000,000 to the Sports and
Entertainment Company for the concerts at the Venue.  The Hedge
Fund Representative stated, in sum and substance, as part of
standard procedure, the Hedge Fund needed to confirm with Sports
and Entertainment Company that their wire information was
correct.  CARTON replied that the Sports and Entertainment
Company may be unable to confirm because their "execs are in
Orlando . . . in meetings most of the day."  CARTON further
stated, in sum and substance, that he would be willing to
confirm the wire information on behalf of the Sports and
Entertainment Company.  The Hedge Fund Representative agreed.
Based on my interviews with representatives of the Sports and
Entertainment Company, I have learned that neither the Sports
and Entertainment Company Executive nor the CEO were in Orlando
that day.

### CARTON, WRIGHT, and CC-1 Misappropriate Additional Hedge Fund Investments

15.  Based on, among other things, my review of emails,
text messages, and bank records, as well as my conversations
with Agent-1 regarding his interviews with personnel from the
Sports and Entertainment Company and the Hedge Fund, I have
learned the following:

a.    Later on December 19, after CRAIG CARTON, the
defendant, falsely told the Hedge Fund that the Sports and
Entertainment Company executives were "in Orlando," the Hedge
Fund wired $1,000,000 to the CC-1 Entity Account.  The Hedge
Fund intended this wire to be used to finance the investment in
tickets to the Band-2 North American tour, as discussed in
paragraph 14(f) above.

b.    Two days later, on December 21, however, the CC-1
Entity Account wired a total of $990,000 to two individuals
("Investor-2" and "Investor-3").  Earlier in 2016, Investor-2
and Investor-3 had invested over $8,000,000 with CC-1
collectively, based on representations that the funds would be
used purchase event tickets, including tickets to a Broadway
show and a concert tour by a particular performer.  Instead, CC-
1 had misappropriated these funds for his own use.  Based on my
interview of Investor-2 and my review of emails, I believe the
payments made to Investor-2 and Investor-3 on December 21 were a
purported return on their prior investment.

c.    On December 20, the Hedge Fund wired $2,000,000
to the Sports and Entertainment Company, to finance CARTON's
purchase of tickets for the concerts at the Sports and

Entertainment Company Venue, as discussed in paragraph 14(f) above.

        d.    However, even before the wire arrived, CARTON, unbeknownst to the Hedge Fund, contacted the Sports and Entertainment Company and stated, in sum and substance, that the $2,000,000 wire had been sent in error by the Hedge Fund. CARTON instructed the Sports and Entertainment Company to wire the money to a bank account for an entity operated by CARTON and MICHAEL WRIGHT, the defendant, and for which WRIGHT is the signatory (the "CARTON/WRIGHT Entity-2 Account").[5]

        e.    On December 21, 2016 the Sports and Entertainment Company complied with CARTON's request, and none of the $2,000,000 was used to purchase tickets at the Sports and Entertainment Company. Shortly after receiving the $2,000,000 in the CARTON/WRIGHT Entity-2 Account, WRIGHT wired (i) $966,000 to WRIGHT's personal bank account, which was the same amount WRIGHT had previously told CARTON he owed to Entity-1, due December 22, and (ii) $700,000 to the CARTON Bank Account. Also on December 21 and 22, CARTON wired approximately $188,000 from the CARTON Bank Account, including at least $133,000 in wires to several casinos, at least some of which are located outside of New York state.

        f.    On or about December 22, 2016, a representative of the Hedge Fund contacted CARTON and stated, in sum and substance, that the Hedge Fund would wire an additional $900,000 to the CC-1 Entity, to provide further financing for the purchase of tickets to the Band-2 North American tour. Based on my review of bank records, I have learned that the Hedge Fund sent $900,000 that same day, December 22, to the CC-1 Entity Account.

        g.    The following day, CARTON texted CC-1 and asked CC-1 to "wire to me direct today[.]  I have everything in place based on receiving the 600 [t]oday. . . ."  WRIGHT responded[6] "I

---

[5] On the evening of December 18, 2016, MICHAEL WRIGHT, the defendant, emailed CARTON wire routing information for the CARTON/WRIGHT Entity Account, which CARTON then conveyed to the Sports and Entertainment Company.

[6] For text messages discussed in this paragraph, for texts incoming to CC-1's phone, the extraction report shows only one other party to the communication, either CARTON or WRIGHT. For outgoing texts that appear to be part of the same conversation, the extraction reports show both CARTON and WRIGHT as

think that would be most efficient. I wouldn't get to my bank till 2 or 3 which means the wire wouldn't clear till Tuesday. Monday is a bank holiday." CC-1 then texted CARTON and WRIGHT stating "Guys –we have problem.  There was a storm that took out all wifi and Internet . . . I can't send a wire let alone contact my banker . . . Send me account info. I will try to reach my dad and see if he can bridge immediately." CARTON subsequently texted WRIGHT and CC-1, stating "MW: Give my account please." WRIGHT then texted CC-1 account information for the CARTON Bank Account. CC-1 then texted CARTON, stating "Coming in several wires 400, 150 and 50." The CC-1 Entity Account wired $400,000 to the CARTON Bank Account and $500,000 to Investor-2. Based on my review of emails and my interview of Investor-1, I believe that this payment to Investor-2 was a purported return on Investor-2's earlier investment.

      h.    That same day, December 23, CARTON sent several wires from the CARTON Bank Account totaling approximately $1,050,000, including $500,000 in payments to a casino and a $250,000 payment to Investor-1, who, as noted above, had invested $1,000,000 with CARTON and CC-1 to finance CARTON's purchase of tickets for a concert tour of a well-known performer. Based on my review of emails and my interview of Investor-1, I believe that this payment to Investor-1 was a purported return on Investor-1's earlier investment.[7]

      i.    On December 28, 2016, the CC-1 Entity Account wired an additional $200,000 to the CARTON Bank Account, which I believe was the balance of the "600" referenced in CC-1's text paragraph 15(g) above. That same day, the CARTON Bank Account wired $400,000 to an entity that operates resorts and casinos.

---

recipients.  As such, I believe this conversation was actually a three-way conversation involving WRIGHT, CARTON, and CC-1.

[7] On or about December 5, 2016, for example, CARTON emailed Investor-1, stating that CC-1 had "personally guarantee[d] the return of [Investor-1's] principal and interest prior to December 24th. . . ."

      WHEREFORE, I respectfully request that arrest warrants be
issued for CRAIG CARTON and MICAHEL WRIGHT, the defendants, and
that they be arrested and imprisoned or bailed, as the case may
be.


SEAN SWEENEY
Special Agent
Federal Bureau of Investigation


Sworn to before me this
5th day of September, 2017

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK